**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**SHEILA SUE BAXTER**

                              **Plaintiff,**                              **01-CV-0157A(Sr)**

**v.**

**LARRY G. MASSANARI,**
**Acting Commissioner of Social Security,**

                              **Defendant.**

---

## REPORT, RECOMMENDATION AND ORDER

        This matter was referred to the undersigned by the Hon. Richard J.

Arcara, to hear and report, in accordance with 28 U.S.C. § 636(b).  Dkt. #8.


        Plaintiff commenced this action *pro se*, pursuant to 42 U.S.C. § 405(g),

seeking review of the final decision of the Commissioner of Social Security (the

"Commissioner"), denying her application for Supplemental Security Income ("SSI").

Dkt. #1.


        Defendant moved for judgment on the pleadings pursuant to

Fed.R.Civ.P. 12(c).  Dkt. #12.  For the following reasons, it is recommended that the

Commissioner's motion be granted.

## PROCEDURAL BACKGROUND [1]

Plaintiff filed an application for SSI on February 13, 1997, claiming disability as of September 6, 1995 due to a spinal tumor which caused severe back pain and muscle spasms.  T72, 88.  Her application was denied initially and upon reconsideration. T49, 55.  A hearing, as requested by the plaintiff, was conducted on October 21, 1998 before Administrative Law Judge ("ALJ"), Nancy Lee Gregg.  T26. Plaintiff was represented at the hearing by a non-attorney peer advocate for Directions in Independent Living.  T29.  By decision dated December 15, 1998, the ALJ determined that plaintiff was not disabled at any time subsequent to the filing of her application for SSI benefits on February 13, 1997.  T23. The ALJ's determination became the final decision of the Commissioner on December 29, 2000 when the Appeals Council denied plaintiff's appeal. T5.

## FACTUAL BACKGROUND

Medical Records

_____Plaintiff reported back pain after she lifted a heavy box at her home on September 6, 1995.  T162.  She was prescribed pain medication, chiropractic treatment, physical therapy and bed rest by her family physician, Dr. Mongia, but presented to the emergency room and was admitted to WCA Hospital from October 14 -21, 1995 for evaluation and management of severe back pain.  T162.   An MRI revealed a tumor "extending almost from the top of T12 to the bottom of L1," measuring

_____

[1] References to "T" are to the certified transcript of the administrative record filed by the defendant in this action.  Dkt. #7.

"about 5 cm in length and 2 cm in transverse diameter." T159, 165. On December 1, 1995, Dr. Kansal, a neurosurgeon, performed a decompressive laminectomy of T11 to L2 to remove the intradural tumor, which was determined to be an ependymoma. T177, 179-80, 184. Dr. Kansal, reported that "[p]ostoperatively, the patient did very well, with good improvement in her symptoms" and informed Dr. Mongia that "[s]urgery went well with no complications and a full recovery is expected." T177, 183. Plaintiff was discharged to home on December 6, 1995, with no medications prescribed and activity "as tolerated." T177.

Upon examination on December 18, 1995, Dr. Kansal reported that plaintiff was "doing very well" and that he was "quite pleased with the way things have worked out." T199. On January 17, 1996, Dr. Kansal reported that plaintiff was "doing very well with good improvement in her symptoms." T198. He informed Dr. Mongia that he was "quite pleased with the way she is coming around and considering she is doing this well, I am discharging her from my direct care back to you." T198.

On September 24, 1996, plaintiff complained of leg cramps at night and swollen feet and was referred back to Dr. Kansal by her physician's assistant ("P.A."), William Felton, for follow up and assessment of plaintiff's "work ability." T235. P.A. Felton wrote a note indicating that plaintiff could not work until she was released by the neurosurgeon. T248.

Plaintiff returned to Dr. Kansal on October 2, 1996 with complaints of "discomfort in the right knee area;" a "'charlie horse' sensation in the calf muscles on

the right side" and "pain going up and down the leg." T197.  Dr. Kansal's examination

revealed

> no paraspinal spasm.  Lower extremity examination is
> completely benign.  Reflexes are all fine.  Plantars are
> downgoing.

T197.  Dr. Kansal "was not sure what her symptoms could be coming from," but ordered

an MRI "just to be sure."  T197.

> An MRI performed on October 9, 1996 revealed
>
> postoperative scarring in the area of conus.  The top of the
> conus ends at the level of the 12th thoracic vertebral body.
> There is no definite evidence of residual or recurent
> neoplasm.  No enhancing areas were recognized after
> contrast injection.
>
> The vertebral bodies and intevertebral disc spaces are
> normal.  No disc extrusions, protrusions, or sequestrations
> are recognized.
>
> The thoracic cord above the operative site is unremarkable.

T195.  No evidence of residual or metastatic spinal cord tumor, inflammatory disease or

diskitis was found.  T195.  X-rays performed on the same day revealed that

> The vertebral bodies and intervertebral disc spaces are
> normal.  No spondylolysis, spondylolisthesis, or scoliosis is
> appreciated. . . . The perivertebral soft tissues are normal.

T196.

Dr. Kansal informed Dr. Mongia that the MRI of October 9, 1996  "fails to

show any significant problem."  T194.  Dr. Kansal stated that he was "quite pleased with

the MRI finding" and opined that, "at this point, perhaps her symptoms could just be

related to a weak back or some scar tissue which will obviously be there from surgery."

T194.  Dr. Kansal suggested that swimming might ease plaintiff's symptoms.  T194.

P.A. Felton referred plaintiff to physical therapy for muscle strengthening exercises for

the low back on January 10, 1997.  T228, 245.

In early 1997, plaintiff began to complain of severe headaches.  T226.  On

April 25, 1997, plaintiff was referred to Dr. Rao, a neurologist, for further evaluation.

T209, 212, 223, 226.  Progress notes indicate that plaintiff is "unable to work until

cleared by neurology."  T222.

At her initial exam with Dr. Rao on May 1, 1997, Dr. Rao recorded the

following description of plaintiff's symptoms:

> The patient claims that in the beginning her headaches were
> not frequent; however, recently, i.e. in the last month, the
> headaches have become much worse with significant
> nausea and vomiting.  She had two episodes where the
> headaches lasted for several hours to almost a day.  They
> began with bifrontal, as well as nuchal, pain and rapidly
> progressed to a generalized headache.  Preceding that she
> felt nauseous and threw up.

T212.  Dr. Rao ordered an MRI of the brain and an EEG.  T209.

In June of 1997, plaintiff was examined by Dr. Robert Keenan of

Professional Medical Assessments at the request of the New York State Department of

Social Services Office of Disability Determinations.  T202.  Plaintiff reported weekly

headaches lasting 1-12 hours with accompanying nausea, vomiting and floaters in her

vision, which she treated with ibuprofen with mixed results.  T203.   She reported that

she could walk a quarter of a mile or twenty five minutes a day; stand or sit for a maximum of 10 minutes and lie down 20-30 minutes before having to change position due to discomfort.  T204.  She reported that she was able to do laundry, bathe, dress and open jars/bottles without restriction; was able to wash dishes, vacuum, garden, grocery shop, walk up and down stairs, drive a car and lift children in a reduced capacity; but was unable to shovel snow, mow the lawn, take out the garbage, wash floors or do heavy housecleaning.  T204.  Upon physical examination, Dr. Keenan noted the following:

> Central Nervous System – Sensory exam was normal to light touch and pinprick in upper and lower extremities bilaterally. Power was diminished in the left toes versus the right but otherwise was equal and 5/5 in upper and lower extremities bilaterally.  Straight leg raising was 90 degrees, seated, bilaterally.  DTS were 2+ in the upper and lower extremities bilaterally.  Tinel's and Phalen's signs were negative bilaterally.  Fine motor involving the hands was within normal limits bilaterally.  Heel was accomplished but the patient was unsteady.  Gait was slow and even.  Patient got on and off the examination table slowly and carefully but unassisted.

> Musculoskeletal Examination – There was no swelling, redness, heat on the musculoskeletal exam.  There was tenderness over the thoracolumbar spine diffusely.  There was a surgical scar noted from the mid to lower thoracic spine.  There was no other scarring.  There was a negative Lachman's sign, negative drawer's sign and negative pivot shift of the knees bilaterally.

> * * *

> Lumbar Spine: Flexion to 40 degrees; extension to 5 degrees; lateral flexion to 15 degrees, bilaterally, with back pain at the end-points of these movements.

T205-06.

Thereafter, a residual physical functional capacity assessment performed by a state agency medical consultant, Dr.Joung R. Oh, M.D., noted the results of Dr. Keenan's exam and concluded that plaintiff was capable of occasionally lifting, pushing and/or pulling 20 pounds; frequently lifting, pushing and/or pulling 10 pounds; standing about 6 hours in an eight hour workday; and sitting about 6 hours in an eight hour workday; with no limitations on climbing, balancing, stooping, kneeling, crouching, and crawling.  T130-31.  Due to the history of headaches, it was recommended that plaintiff avoid hazards such as machinery or heights.  T133.

During a follow-up examination on July 16, 1997, Dr. Rao reported the following:

> Sheila was seen on 5/01/97 for headaches which were thought to be muscle contraction and vascular headaches. She had an EEG which is normal.  The MRI of the brain is also normal.  Her headaches are easily relieved with Ibuprofen.  Her fundi are normal.  Neurological examination does not show any lateralizing signs.  Based on this and improvement with Ibuprofen, I have discharged her.

T209.

Plaintiff's family physician, Zia Sheikh, M.D., prescribed Depakote and Esgic for the headaches on July 22, 1997 and noted that plaintiff could return to work without restrictions.  T221.  Beginning September 3, 1997, plaintiff reported that her headaches were much better with continued use of the Depakote and Esgic.  T219-20, 283, 289, 291-93.

On November 11, 1997, plaintiff underwent a second examination by Dr. Robert Keenan of Professional Medical Assessments at the request of the New York State Department of Social Services Office of Disability Determinations, with similar results as the prior examination.  T249-56.  Thereafter, a residual physical functional capacity assessment performed by a state agency medical consultant, Dr. Anthony L. Danza, M.D., noted

> no sensory-motor reflex [changes]. No muscle atrophy or weakness.  No disc degeneration on x-ray

and concluded that plaintiff was capable of occasionally lifting, pushing and/or pulling 20 pounds; frequently lifting, pushing and/or pulling 10 pounds; standing about 6 hours in an eight hour workday; sitting about 6 hours in an eight hour workday; and occasionally climbing, balancing, stooping, kneeling, crouching, and crawling.  T122-23.

On February 9, 1998, Dr. Sheikh prescribed quinine sulfate for plaintiff's complaints of leg cramps.  T283, 288.  On April 8, 1998, plaintiff presented to Dr. Sheikh with complaints of back pain, swollen, blue feet, and headaches.  T282.  She was prescribed motrin and a muscle relaxant.  T282.  Dr. Sheikh questioned whether plaintiff's shoes were too tight or whether she had Raynauds Syndrome.  T282.  On May 14, 1998, Dr. Sheikh, noted back pain, chronic muscular pain and fibromyalgia syndrome, for which she prescribed 600 mg Motrin every 6 hours.  T278.  Dr. Sheikh continued plaintiff's prescription of Depakote, noting that it controls her headaches. T278.  On June 4, 1998, Dr. Sheikh, diagnosed plaintiff with depression and prescribed Wellbutrin.  T277.

On August 14, 1998, Dr. Sheikh completed a Medical Report for Determination of Disability, indicating that plaintiff's ability to perform repetitive stooping and bending or to remain seated for long periods was abnormal because she experiences pain in her back and has to lie down. T298. Dr. Sheikh determined that plaintiff was able to lift 10 lbs. occasionally; stand or walk for 2 hours a day; and sit for more than 6 hours per day. T298. Dr. Sheikh denied the presence of any mental disorders. T297.

Plaintiff underwent surgery for removal of a cyst on her cocyx on October 6, 1998. T267.

In a progress note dated October 15, 1998, Dr. Sheikh reported plaintiff's complaints

> of lower back pain, which is a dull ache and band-like sensation at the region of L3-L4 and L5. She complains that the pain increases with bending, lifting or prolonged standing. The patient says that she cannot even stand for a stretch of one hour, and has severe back pain. Currently she is having severe anxiety attacks. There are some family problems going on. She denies any suicidal or homicidal ideations. She denies any depression or signs of melancholia.

T305. Upon examination, Dr. Sheikh observed

> Lumbrosacral spine is nontender. Paravertebral muscle spasm and tenderness is positive bilaterally in the L3-L4, L5. SLR is negative. Linder sign is negative. Gait is normal.

T305. He continued plaintiff's prescription for Ibuprofen and prescribed Vistaril for anxiety. T305.

In a  progress note dated November 12, 1998, Dr. Sheikh recounted that

> The patient continues to have headaches, and she complains that these are throbbing headaches, sometimes on the right and sometimes on the left.  Currently she is taking Depakote for this condition and Esgic Plus.  She says that the headaches are under very good control.  The patient does complain of depression, which has been off and on. Currently she is taking Wellbutrin SR 150 mg p.o. b.i.d. for this condition. . . . The patient does have a very long history of lower back pain, for which she takes ibuprofen and is controlled with it.  She does complain that prolonged standing, bending, lifting, and pushing increases this pain. She says that lifting more than 30 pounds makes her back pain worse, or pushing more than 30 pounds also makes the back pain worse.  The back pain is usually in the lower region at L3-L4 and L5-S1 region, which is a dull ache in nature radiating into both the buttocks, though no radiation into the legs. . . . The patient can walk about two miles, and then gets severe pain.  The pain radiates more so towards the posterior aspect of the left thigh.  She also complains of pain off and on in the knees, ankles, hips bilaterally. Regarding her depression, she is very stressed out with the situation regarding disability, though other than that her depression is under control.

T303.  Upon examination, Dr. Sheikh reported

> Paravertebral muscle tenderness is positive at the region of L3-L4, L5 and S1.  SLR is negative.  Linder sign is negative. DTRs are slightly depressed on the left side, especially the knee jerk.  Ankle jerks are normal.  There is no muscle atrophy.  Anterior flexion is about 60 degrees, and posterior extension is more than 35 degrees.  The patient can twist and turn, and can stand up from a squatting position, though she has signs of discomfort on her face.  She can also get up from a lying down position, though she prefers to get up with the left side preference.  Her gait is normal.

T303.  Dr. Sheikh set forth the following assessment of plaintiff's condition:

> 1.     Headaches.  These are migraines and currently are well controlled on Depakote.  We will continue 250 mg. p.o. t.i.d. Esgic Plus on a p.r.n. basis At the present time, the headaches are not hampering her daily activities.

2.      Depression, well controlled on Wellbutrin.  The
        patient will continue on the same dosages.  I feel that
        this depressive episode and anxiety is situational in
        relation to the stressful event.

3.      Back Pain.  This is most probably myofascial pain
        syndrome.  The patient has had physical therapy in
        the past, though she does not want to have more.
        She says that it would hurt her back more.  At the
        present time, there are no signs or nerve root
        compression.  We will continue Lodine 400 mg p.o.
        b.i.d.

* * *

6.      Benign meningioma in the back, status post resection.

T304.  Dr. Sheikh noted that plaintiff was asking about the status of work and opined

that

At the present time, I feel that she can return to work, and
the reason for not giving her a return to work earlier was
severe back pain, depression and uncontrolled headaches.
Now things are much better.

T304.


Hearing Testimony

Plaintiff was born on June 23, 1965.  T30.  She is single, but resides with

her two children, ages two and six at the time of the hearing, and their father.  T31.

Plaintiff completed the tenth grade.  T31.  Her last employment was from February to

May of 1988, when she worked part-time as a sales clerk at a convenient store.  T34.

In addition to operating the cash register, plaintiff was responsible for stocking the

coolers and shelves and mopping the floors.  T34.

Plaintiff injured her back picking up a box of books on September 6, 1995. T41.  She went to Dr. Lee on September 7, 1995 and is currently treating with Dr. Sheikh at the clinic approximately once a month.  T41.

Plaintiff testified that she suffers from constant pain in back, which she described "like a throbbing toothache that doesn't go away."  T35.  She stated that she also experiences

> hot streaks that runs [sic] down my left leg, that's usually there all the time.  And charlie horses in my calves.  Catches in my hips.

T35, 38.  Plaintiff described the pain as constant.  T35.  To relieve the pain, plaintiff takes "an ibuprofen," lies down and hopes it eases up.  T36.  She testified that the ibuprofen helps "[s]ome," but that the pain "never goes away."  T36.

Plaintiff testified that she is able to pick up the kids' laundry, wash laundry and wash dishes, although she often has to take a break and sit or lie down because her legs start tingling.  T36-37.  She also testified that she usually walks about an eighth of a mile to the post office and back, explaining "[i]t's not too bad when I go that short of a distance."  T36.  Plaintiff added that sometimes she becomes tired just going out in her driveway, which she described as "straight uphill."  T37.  She also noted that her feet often swell when she walks.  T37.

Plaintiff testified that she can stand or sit for approximately five minutes and lift about eight pounds, but not repetitively.  T39-40.  She drives three or four miles

to the grocery store and school approximately three times per week.  T40.  The farthest

she drives is to Olean, which is approximately sixteen miles from her home.  T40.  She

has had to pull over and move around during this drive.  T40.

Plaintiff also complained of migraine headaches which cause blurred

vision and vomiting.  T37.  She testified that she is unable to tolerate light or noise

when she is experiencing such a headache.  T37.  Although Depakote has reduced the

frequency, plaintiff stated that she still experiences migraines approximately twice a

month.  T37-38.

ALJ's Decision

Affording plaintiff the benefit of the doubt based upon her history of a

spinal tumor, headaches and depression, ALJ Gregg determined that plaintiff suffers

from a severe impairment, but did not find her condition met or equaled the listings.

T16.  ALJ Gregg noted that

> Overall, the objective medical evidence provides little
> support for a finding that the claimant was disabled at any
> time from March 1997 to the present.  Findings regarding
> her back problems from March 1997 to the present have
> involved essentially negative test results with some
> tenderness and limitation of motion.  Objective findings
> regarding headaches were negative.  Depression was
> mentioned once in three years of medical reports.

T18.  Based upon these medical records, ALJ Gregg determined that plaintiff

possessed the residual functional capacity to perform work-related activities except for

work involving lifting and carrying over ten pounds on a frequent basis and twenty

pounds on an occasional basis.  T16-17.   In other words, ALJ Gregg found that plaintiff

-13-

retained the capacity to perform light work.[2]  T18.   In light of this determination, ALJ

Gregg found that plaintiff was capable of performing her past relevant work as a

salesclerk.  T14.


In reaching this conclusion, ALJ Gregg declined to give controlling or even

great weight to the assessment of plaintiff's treating physician, Dr. Zia Sheikh, because

"this assessment was based on the claimant's subjective complaints that plaintiff

> gets pain in her back and has to lie down.  Dr. Sheikh noted
> that the claimant had no sensory loss and no motor loss;
> although he reported that she had a decreased right knee
> reflex, he noted no atrophy.  His assessment of the
> claimant's functional capacity is not supported by the greater
> weight of the total evidence contained in the record.

T18.  With respect to plaintiff's subjective complaints, the ALJ determined that plaintiff's

> allegations of functional limitations appear to involve
> exaggeration when compared to the minimal objective
> evidence and other evidence of record.  The claimant states
> that she can only sit or stand for about five minutes at a time
> and can only lift eight pounds occasionally.  The record
> contains no indication that any treating source has assessed
> such restrictions and there is no other evidence to support
> such extreme functional limitations.

T19.  The ALJ noted that plaintiff's

> statements regarding daily activities show that she is still
> able to engage in light activities, which would not be possible
> if she had the extreme functional limitations alleged.  She
> testified that she is able to wash dishes, do laundry, and do
> grocery shopping.  She is able to drive a car.  She told an

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category
when it requires a good deal of walking or standing, or when it involves sitting most of the time with some
pushing and pulling of arm or leg controls.  If someone can do light work, we determine that he or she can
also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability
to sit for long periods of time."  20 C.F.R. § 416.967.

examining physician that she still does some gardening. She told the physician that she is able to perform lighter household chores, such as dusting and vacuuming, but cannot perform heavier chores, such as shoveling snow or mowing the lawn.

T19.  In summary, the ALJ opined that

the claimant was an active, athletic person, who was forced to reduce her activity due to back problems and other conditions.  However, her conditions received prompt, effective treatment, and she has no impairment or combination of impairments that can be considered totally disabling.

T21.

## DISCUSSION

### Scope of Judicial Review

The Social Security Act states that, upon review of the Commissioner's decision by the district court, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive . . .."  42 U.S.C. § 405(g). Substantial evidence is defined as evidence which a "reasonable mind might accept as adequate to support a conclusion . . .."  *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938), *quoted in Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Tejada v. Apfel,* 167 F.3d 770, 773-74 (2d Cir. 1999); *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999).

Under this standard, the scope of judicial review of the Commissioner's decision is limited, and the reviewing court may not try the case *de novo* nor substitute

its findings for those of the Commissioner. *Richardson*, 402 U.S. at 401. The Court's

sole inquiry is "whether the record, read as a whole, yields such evidence as would

allow a reasonable mind to accept the conclusions reached" by the Commissioner.

*Sample v. Schweiker,* 694 F.2d 639, 642 (9th Cir. 1982). "Further, if supported by

substantial evidence, the [Commissioner's] finding must be sustained, 'even where

substantial evidence may support the plaintiff's position and despite that the Court's

independent analysis of the evidence may differ from the [Commissioner's].'" *Martin v.*

*Shalala,* No. 93-CV-898S, 1995 WL 222059, at *5 (W.D.N.Y. March 20, 1995), *citing*

*Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).


Before applying the substantial evidence test, the Court first "reviews the

Commissioner's decision to determine whether the Commissioner applied the correct

legal standard." *Tejada v. Apfel*, 167 F.3d at 773; *Johnson v. Bowen*, 817 F.2d 983,

985 (2d Cir. 1987). "Failure to apply the correct legal standards is grounds for

reversal." *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984); *see Grey v. Heckler*,

721 F.2d 41, 44 (2d Cir. 1983) (Commissioner's determination "cannot be upheld when

based on an erroneous view of the law that improperly disregards highly probative

evidence.").


**The Disability Standard**.

The standards set forth in the Social Security Act provide that a person

will be found to be disabled "if he is unable to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which . . . has

lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. § 1382c(a)(3)(A).  The Act clarifies that "an individual shall be

determined to be under a disability only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy . . .." 42 U.S.C.

§ 1382c(a)(3)(B).


In assessing whether a claimant is suffering from a disability, the ALJ is

required to follow a five-step sequential evaluation process:

1.      The Commissioner considers whether the claimant is
        currently engaged in substantial gainful activity.

2.      If not, the Commissioner considers whether the
        claimant has a "severe impairment" which limits his or
        her mental or physical ability to do basic work
        activities.

3.      If the claimant has a "severe impairment," the
        Commissioner must ask whether, based solely on
        medical evidence, the claimant has an impairment
        listed in Appendix 1 of the regulations.  If the claimant
        has one of these enumerated impairments, the
        Commissioner will automatically consider him
        disabled, without considering vocational factors such
        as age, education, and work experience.

4.      If the impairment is not "listed" in the regulations, the
        Commissioner then asks whether, despite the
        claimant's severe impairment, he or she has the
        residual functional capacity to perform his or her past
        work.

5.      If the claimant is unable to perform his or her past
        work, the Commissioner then determines whether

there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d at 132, *citing DeChirico v. Callahan*, 134 F.3d 1177, 1179-80

(2d Cir. 1986); *see* 20 C.F.R. § 404.1520 (1999).


**Weight of Medical Opinion – Treating Physician Rule**

The method by which the Social Security Administration is supposed to weigh medical opinions is set forth at 20 C.F.R. § 404.1527(d).  The regulations say that a treating physician's report is generally given more weight than other reports and that a treating physician's opinion will be controlling if it is "well-supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record."  *Id.* § 404.1527(d)(2).

When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling.  And the less consistent that opinion is with the record as a whole, the less weight it will be given.  *See Id.* § 404.1527(d)(4).  Moreover, some kinds of findings – including the ultimate finding of whether a claimant is disabled and cannot work – are "reserved to the Commissioner."  *See Id.* § 404.1527(e)(1).  That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.  A treating physician's statement that the claimant is disabled cannot itself be determinative.

*Snell*, 177 F.3d at 133.  Thus, "[w]hile the opinions of a treating physician deserve

special respect, they need not be given controlling weight where they are contradicted

by other substantial evidence in the record."  *Veino v. Barnhart*, 312 F.3d 578, 588 (2d

Cir. 2002) (citations omitted).

When the Commissioner determines that a medical source opinion is not entitled to controlling weight, the Commissioner must provide "good reasons" for not crediting the opinion.  *Snell*, 177 F.3d at 133; *see* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").  In addition, the Commissioner must consider relevant factors to determine the appropriate weight to accord that opinion.  *Shaw*, 221 F.3d at 134.  The factors that must be considered when the treating physician's opinion is not given controlling weight include: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist."  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *see* 20 C.F.R. § 416.927(d).

"Unlike the opinions of treating physicians, opinions of state-agency medical consultants are not presumptively entitled to any particular weight."  *Torres v. Barnhart*, 2005 WL 147412, at *6 (E.D.N.Y. Jan. 24, 2005), *citing* 20 C.F.R. §§ 404.1527(f)(2)(I) & 416.927(f)(2)(i).  Such opinions must be evaluated in accordance with criteria governing all medical opinions, and the ALJ must explain the weight given to the opinions of a state agency medical consultant unless the opinion of the treating physician is afforded controlling weight.  *Id., citing*  20 C.F.R. §§ 404.1527(f)(2)(ii) & 416.927(f)(2)(ii).   An examining consulting physician's opinion is generally entitled to limited weight because a consulting physician's examination of a claimant is often brief, without the opportunity for review of a claimant's medical history.  *Crespo v. Apfel*, 1999

WL 144483, at *7 (S.D.N.Y. Mar. 17, 1999).  Opinions of nonexamining sources,

including state agency medical consultants are entitled to even less weight than an

examining medical consultant.  20 C.F.R. § 416.927(d)(1).  An ALJ is not permitted to

"substitute his own judgment for competent medical opinion."  *Balsamo v. Chater*, 142

F.3d 75, 81 (2d 1998).

**Analysis**

   Although plaintiff did suffer an ependymoma, which required a

decompressive laminectomy of T11 to L2, plaintiff's neurosurgeon found no objective

basis for plaintiff's ongoing complaints and imposed no restrictions upon plaintiff's

activities.  T177, 183, 194, 198-99.  Subsequent examinations by Dr. Sheikh and Dr.

Keenan also failed to yield any objective basis for the extent of plaintiff's complaints

with respect to her back.  T205-06, 249-253, 303, 305.

   With respect to plaintiff's headaches, Dr. Rao released plaintiff from his

care without restrictions following normal MRI and EEG results and noted improvement

with Ibuprofen.  T209.  Plaintiff's medical records indicate that her headaches were well

controlled with prescription medication and were "not hampering her daily activities."

T217, 220-21, 278, 283, 291-93, 303-04.  As a result, Dr. Sheikh cleared plaintiff to

return to work as of July 22, 1997.  T221.

   Although plaintiff was diagnosed with depression and anxiety, Dr. Sheikh

opined that these conditions were situational and well controlled with prescription

medication.  T304.  Dr. Sheikh denied the presence of a mental disorder in his medical

report for determination of disability. T297.


Moreover, plaintiff's recitation of her limitations are contradictory.  For

example, although plaintiff's hearing testimony on October 28, 1998 was that she could

walk about an eighth of a mile, she reported to Dr. Sheikh on November 12, 1998 that

she could walk about two miles.  T36, 303.  Similarly, although plaintiff testified at her

hearing that she could lift about eight pounds comfortably, but not repetitively, she

informed Dr. Sheikh only a few weeks later that lifting or pushing more than thirty

pounds makes her back pain worse.  T40, 303.  In addition, plaintiff's report of daily

activities contradicts her assessment of physical limitations.  For example, plaintiff

reports that she can lift her children, drive, garden, vacuum, grocery shop, cook meals,

wash dishes, do laundry and walk up and down stairs, albeit in a reduced capacity.

T36-37, 110, 204, 251.


Given the consistency of the objective medical findings obtained by all of

the physicians who examined plaintiff and the divergence in opinion among these

professionals regarding plaintiff's residual functional capacity, as well as the

contradictions between plaintiff's and Dr. Sheikh's recitation of her limitations, the ALJ

did not err in refusing to afford controlling weight to Dr. Sheikh's opinion.  Furthermore,

when the objective medical evidence is reconciled with the medical opinion evidence

and plaintiff's own statements, it is clear that the ALJ's determination that plaintiff has

been forced to curtail her previously active, athletic lifestyle, but remains capable of performing light work, which includes her past relevant work as a salesclerk, is supported by substantial evidence.


**CONCLUSION**

Based on the foregoing, it is recommended that the Commissioner's motion be granted.  Dkt. #12.


Accordingly, pursuant to 28 U.S.C. § 636(b)(1), it is hereby


ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.


ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).


The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

<u>Failure to file objections within the specified time or to request an</u>

<u>extension of such time waives the right to appeal the District Court's Order</u>.   *Thomas v.*

*Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*,

838 F.2d 55 (2d Cir. 1988).


The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local

Rules for the Western District of New York, "written objections shall specifically identify

the portions of the proposed findings and recommendations to which objection is made

and the basis for such objection and shall be supported by legal authority."   <u>Failure to</u>

<u>comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of</u>

<u>Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report,</u>

<u>Recommendation and Order), may result in the District Judge's refusal to consider the</u>

<u>objection.</u>


The Clerk is hereby directed to send a copy of this Order and a copy of

the Report and Recommendation to the plaintiff and the attorney for the Commissioner.


**SO ORDERED.**

DATED:   Buffalo, New York
August 17, 2005

S/ H. Kenneth Schroeder, Jr.
H. KENNETH SCHROEDER, JR.
United States Magistrate Judge